# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 20-0990V
UNPUBLISHED

| | |
|---|---|
| MARK ALCANTARA, | Chief Special Master Corcoran |
| Petitioner, | Filed: June 10, 2022 |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | Special Processing Unit (SPU); Decision Awarding Damages; Pain and Suffering; Influenza (Flu) Vaccine; Shoulder Injury Related to Vaccine Administration (SIRVA) |
| Respondent. | |

*Jimmy A. Zgheib, Zgheib Sayad, P.C., White Plains, NY, for Petitioner.*

*Debra A. Filteau Begley, U.S. Department of Justice, Washington, DC, for Respondent.*

### DECISION AWARDING DAMAGES[1]

On August 7, 2020, Mark Alcantara filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a left shoulder injury related to vaccine administration ("SIRVA") resulting from adverse effects of an influenza ("flu") vaccine received on August 30, 2019. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters. Although Respondent conceded entitlement, the parties could not agree on damages, and therefore their dispute was presented at a "Motions Day" hearing.

---

[1] Because this unpublished Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons described below, I find that Petitioner is entitled to an award of damages in the amount of **$72,306.41**, **representing $70,000.00 for actual pain and suffering, and $2,306.41 for past unreimbursable expenses.**

## I.    Relevant Procedural History

On August 10, 2020, Petitioner filed Exhibits 1-8 containing medical records and an affidavit (ECF No. 6). The initial status conference was held on October 26, 2020. Over the next twelve months, Petitioner filed additional medical records and employment records as Exhibits 9-22 (ECF Nos. 12, 14, 19, and 24-27). Respondent conceded that Petitioner was entitled to compensation, and a ruling to that effect was entered on October 12, 2021 (ECF No. 30). The parties then began damages negotiations.

On December 9, 2021, Petitioner filed a joint status report stating that the parties had reached an impasse on damages (ECF No. 35). The parties proposed filing damages briefs, and stated that they were amenable to an expedited damages hearing. To that end, Petitioner filed his damages brief on January 4, 2022 (ECF No. 37). On March 7, 2022, Respondent filed a responsive brief (ECF No. 39), and Petitioner replied on March 11, 2022 (ECF No. 40).

On April 12, 2022, the parties were directed to confer about unreimbursable expenses and attempt to reach agreement on such issues or narrow the disputed categories (ECF No. 41). On April 19, 2022, the parties were directed to file a joint status report indicating their availability for a May 20, 2022 Motions Day hearing (ECF No. 42).

On April 20, 2022, Petitioner filed a joint status report stating that the parties were amenable to and available for an expedited Motions Day damages hearing on May 20, 2022 (ECF No. 43). Petitioner also reported that the parties disagreed on pain and suffering, but had conferred concerning the disputed expenses and narrowed the dispute somewhat. In particular, Petitioner reported that the parties "now agree on all expenses for treatment through October 16, 2020." Joint Status Report, filed April 20, 2022, at *1. Petitioner reported that Respondent recommended reimbursement of out-of-pocket expenses of $2,306.41, but Respondent questioned treatment costs incurred between August 24, 2021 to September 17, 2021, totaling $744.12. *Id.* at *1, 3.

The Motions Day hearing occurred as scheduled, and this written decision memorializes my oral rulings issued at the conclusion of the hearing and set forth in the transcript, which was filed on June 7, 2022.

## II.     Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, a special master may rely on his or her own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must be stressed that pain and suffering is not determined based on a continuum. *See Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579 (2013).

III.    **Appropriate Compensation in this SIRVA Case**

   A. **Pain and Suffering**

There is no dispute about Petitioner's awareness of his injury, leaving only severity and duration to be considered. In determining an appropriate award, I have reviewed the complete record in this case, as well as prior awards. My determination is based on the specific circumstances of this case.

   1. **Relevant Medical History**

On August 30, 2019, Petitioner received a flu vaccine intramuscularly in his left upper arm at Rite Aid. Ex. 2 at 1. He was 52 years old and employed by Federal Express as a courier. *Id.*; Ex. 16 at 3.

On September 3, 2019, Petitioner called the VA Medical Center stating that he had injured his left shoulder and wanted an MRI. Ex. 4 at 16, 71. The following day, he reported to a VA nurse that he had a flu shot four days earlier and his left shoulder was painful. *Id.* at 15, 70. A friend who is a nurse told Petitioner he needed x-rays and an MRI. *Id.* The VA nurse told Petitioner that a vaccine was not an indication for an MRI, and that he should follow up if the pain continued. *Id.* Petitioner responded that he had made an orthopedic appointment with a non-VA provider. *Id.*

On September 3, 2019, Petitioner was seen at urgent care by Dr. Bryan Doonan. Ex. 5 at 8. He complained of left shoulder pain and soreness following a flu vaccine five days earlier. *Id.* He had tried ice, with no relief. *Id.* On examination, he had no limitations in range of motion ("ROM"), and negative impingement signs. *Id.* He was assessed with left shoulder pain and immunization complications, and given a ketorolac injection and naproxen. *Id.* at 9.

On September 11, 2019, Petitioner was seen by orthopedist Dr. Erik Stark. Ex. 6 at 4-5. He reported left shoulder pain since he received a flu shot the Friday before Labor Day. *Id.* at 4. He stated that experienced a burning sensation that worsened throughout the day and night, and that since then he has experienced dull aching pain, stiffness, burning, and sharp aching. *Id.* He reported that he was a FedEx driver who did deliveries, and that because of his symptoms he was unable to perform all of his work functions. *Id.* He was unable to perform five of the 12 activities of daily living on the intake form. *Id.* He had been using ice, non-steroidal anti-inflammatories, activity modification, and a sling, with no improvement. *Id.* On examination, his left shoulder ROM was slightly limited and painful: "[o]verhead elevation to 160 degrees with pain, internal rotation to 45 degrees vs

60 degrees, external rotation is 90 degrees vs 100 degrees." *Id.* at 5. Petitioner had a positive Hawkins impingement sign, pain against resistance with deltoid strength testing, and a positive lift off sign. *Id.* Left shoulder x-rays were negative. *Id.* Petitioner was assessed with left shoulder pain, rotator cuff weakness, and possible rotator cuff tear. *Id.* Dr. Stark was concerned that the flu shot may have been incorrectly administered and damaged his rotator cuff. *Id.* Another possibility was that the injection may have left him sore and he injured his rotator cuff during work. *Id.* Dr. Stark ordered an MRI to determine whether surgery was appropriate. *Id.* He deferred administering a steroid injection, as that would require postponing surgery for at least three months. *Id.*

The record includes a medical information form filled out by Petitioner that appears to be from his first appointment with Dr. Stark. Ex. 6 at 6. On the form, Petitioner checked both slight and moderate in response to a question about the severity of his symptoms. *Id.*

On September 30, 2019, Petitioner underwent a left shoulder MRI. Ex. 6 at 13-14. The MRI showed a probable anteroinferior labral tear, no rotator cuff tear, and mild acromioclavicular joint arthropathy, with mild surrounding edema. *Id.* The report indicated that a type I sprain was a consideration in the proper clinical context. *Id.* at 14. Trace subacromial and subdeltoid bursitis were noted. *Id.* at 13.

On October 8, 2019, Petitioner returned to Dr. Stark for a follow up. Ex. 6 at 2. He reported that he was feeling better than at the previous visit, and reported pain along the deltoid and down into his bicep/tricep. *Id.* Dr. Stark reviewed the MRI, and assessed Petitioner with left shoulder pain, labral tear, and arthropathy. *Id.* Dr. Stark determined that Petitioner's findings were mild and did not require surgical intervention, and administered an ultrasound-guided cortisone injection. *Id.* Petitioner was referred to physical therapy. *Id.*

On November 4, 2019, Petitioner underwent a physical therapy evaluation for his left shoulder. Ex. 6 at 88-89. He reported functional decline in reaching, lifting, carrying, activities of daily living, pushing and pulling, and sleeping. *Id.* at 88. He reported pain levels of 2/10 at rest and 6/10 with activity. *Id.* On examination, his left shoulder passive ROM was 165 degrees in flexion, 50 degrees in internal rotation, and 85 degrees in external rotation.[3] *Id.* The physical therapist determined that Petitioner had decreased ROM and flexibility, weakness, postural dysfunction, pain, interrupted sleep, activity limitations, decreased function, and balance impairment. *Id.* at 89. Petitioner's internal

---

[3] Normal shoulder for adults ranges from approximately 165 to 180 in flexion, 70 to 90 degrees in internal rotation, and 90 to 100 degrees in external rotation. Cynthia C. Norkin and D. Joyce White, MEASUREMENT OF JOINT MOTION: A GUIDE TO GONIOMETRY 72, 84, 88 (F. A. Davis Co., 5th ed. 2016).

and external rotation were described as "painfully we[a]k." *Id.* A plan was established for Petitioner to attend physical therapy twice a week for six weeks. *Id.* Petitioner continued physical therapy through July 1, 2020, attending 25 sessions between November 2019 and July 2020. *Id.* at 40-74.

On January 8, 2020, Petitioner was seen by Dr. Stark for a follow up visit. Ex. 6 at 32. He reported that after the cortisone injection in October, his pain lessened in severity, but that he continued to have a constant throbbing pain along his deltoid. *Id.* Dr. Stark determined that Petitioner's symptoms had improved mildly since the last appointment. *Id.* at 33. Dr. Stark indicated that Petitioner's symptoms were not sufficient to warrant surgery, and that he was limited in the treatment he could offer Petitioner. *Id.* Dr. Stark refilled Petitioner's Meloxicam prescription and directed him to restart formal physical therapy for motion and strengthening. *Id.*

On February 12, 2020, Petitioner reported to his physical therapist that his shoulder was "popping" when he was in the gym doing push-ups. Ex. 6 at 68. At a February 26, 2020 physical therapy session, Petitioner demonstrated full passive ROM, with slight pain in internal rotation. Ex. 6 at 66.

Petitioner returned to Dr. Stark on March 20, 2020. Ex. 6 at 30. He reported left shoulder pain at a level of 5/10. *Id.* He described the pain as a "numbing" pain, as if someone had punched him. *Id.* On examination, Petitioner's left shoulder ROM was painful and limited, with internal rotation of 20 degrees (compared to 60), external rotation 90 degrees (compared to 100), and overhead elevation of 160 degrees with pain. *Id.* at 30-31. Dr. Stark assessed that Petitioner's "findings are not severe enough to warrant surgical interventions as he can typically manage well with NSAIDs." *Id.* at 31. Dr. Stark administered an ultrasound guided cortisone injection and recommended physical therapy. *Id.*

During a physical therapy session on April 27, 2020, Petitioner reported that he had done really well for a month, but when he returned to a full work schedule his shoulder became irritated again. Ex. 6 at 56. He had full ROM in external rotation, but continued to have pain at the end range in flexion. *Id.*

At a physical therapy session on June 18, 2020, he reported that his shoulder improved at the sessions, but work aggravated it. Ex. 6 at 48. On June 22, 2020, he reported that he had done pull ups over the weekend. *Id.* at 46. At his last physical therapy visit on July 1, 2020, he reported that his shoulder had done well over the weekend, but that work that morning had caused pain. *Id.* at 40. He continued to demonstrate guarding into end range external rotation and flexion, but was able to better tolerate joint mobilization. *Id.*

Pharmacy records show that Petitioner filled Meloxicam prescriptions on January 8, March 2, and August 25, 2020. Ex. 13 at 4.

On October 16, 2020, Petitioner was seen by Dr. Stark to follow up concerning his left shoulder pain. Ex. 9 at 4. He reported that the pain had returned, and he was interested in another cortisone injection. *Id.* Dr. Stark administered a third ultrasound-guided cortisone injection. *Id.* at 5.[4]

On February 12, 2021, Petitioner was seen by his primary care physician, Dr. Kien Tran, at the VA Medical Center. Ex. 19 at 43. He reported back pain, pain in his feet, and erectile dysfunction. *Id.* During a pain screening, he reported a pain level of 7 out of 10, reporting pain in his left shoulder, back, and headache. *Id.* at 46. He reported that the pain was chronic, longer than six months, and constant. *Id.* He was given a Meloxicam prescription for pain. *Id.* at 5.

On August 19, 2021, Petitioner was seen by Dr. Tran at the VA Medical Center. Ex. 19 at 34. He reported shoulder pain that flared up on a periodic basis, as well as pain in his back, umbilical and scrotal areas, and right knee. *Id.* at 35. He reported that he had been doing fewer deliveries at his job, only one day per week, with the remaining time as an instructor. *Id.* He reported a pain level of 8 out of 10, reporting pain in his left and right knees. *Id.* at 36. Dr. Tran advised Petitioner to continue with his home physical therapy exercise, proper lifting techniques, compresses, and decreased activities. *Id.* Petitioner's Meloxicam pain prescription was refilled. *Id.* at 5.

On August 24, 2021, Petitioner returned to Dr. Stark. Ex. 18 at 4. He reported that he was taking Meloxicam for pain, and he continued to rate his pain as a "throbbing 5/10 pain." *Id.* Dr. Stark ordered a repeat left shoulder MRI. *Id.* at 5. Dr. Stark noted that Petitioner's symptoms continued in spite of conservative management, including formal physical therapy and three cortisone injections. *Id.*

On September 14, 2021, Petitioner underwent a second left shoulder MRI. Ex. 20 at 4. The MRI was compared to his September 30, 2019 MRI, and found increased arthrosis and hypertrophy of the acromioclavicular joint as well as a possible tear at the anterior labrum. *Id.* at 4-5. Trace bursal fluid was seen. *Id.*

On September 15, 2021, Petitioner underwent a left shoulder physical therapy evaluation. Ex. 20 at 6. The record noted that he had previously done physical therapy for his injury and it had helped. *Id.* The pain had been better managed, although never

---

[4] The record indicates that Petitioner was enrolled in formal physical therapy (Ex. 9 at 5); however, Petitioner has not filed physical therapy records from this time.

fully gone, for many months, but had recently begun to increase again. *Id.* On examination, his left shoulder passive ROM was 170 degrees in flexion, 165 degrees in abduction, 88 degrees in external rotation, and internal rotation was within functional limits. *Id.* The physical therapist indicated that Petitioner demonstrated painfully weak external rotation and internal rotation, in addition to irritation to the median nerve. *Id.* at 7.

Petitioner returned to Dr. Stark on September 17, 2021. Ex. 21 at 4. Petitioner reported that he continued to have pain and weakness, and was no longer able to lift at work. *Id.* Dr. Stark reviewed the MRI and discussed treatment options with Petitioner. *Id.* at 5. Dr. Stark indicated that the torn labrum shown on the MRI could be related to his pain, and that a left shoulder arthroscopy was a possible option. *Id.* at 5-6. Petitioner responded that he would consider his options and follow up when he was ready to plan additional treatment. *Id.*

### 2. Affidavits

Petitioner filed Exhibit 3, an affidavit, averring that his left shoulder symptoms began immediately upon receiving the flu shot, with burning pain that worsened throughout the day. Ex. 3 at ¶ 5. Since then, he has had ongoing pain and limited mobility. *Id.* He stated that he is a FedEx courier and has had difficulty performing his work functions due to this injury. *Id.* He also asserts that he experienced noticeable improvement with months of physical therapy, but continued to have left shoulder pain that increased with work and other activities of daily living. *Id.* at ¶ 15. He took Meloxicam for pain as needed, and experienced increased pain when he ran out of medicine. *Id.*

He reported that he continued to have "constant numbing and throbbing pain in my left shoulder rated 5 out of 10 in severity. The pain increased to 8 out of 10 after a hard day of work." Ex. 3 at ¶ 16. He averred that prior to his injury he loved his job because it kept him active and lean, but because of his injury, his job had become a burden. *Id.* He used to enjoy exercise and other physical activities, but was no longer able to work out or engage in other physical activities because of his left shoulder injury. *Id.* He has since been managing his pain with home exercises, using elastic bands from physical therapy and stretching techniques learned in therapy. Ex. 3 at ¶ 16. In addition, his wife is a massage therapist, and she works on his left shoulder when it is particularly aggravated. *Id.*

### 3. Parties' Arguments

Mr. Alcantara requests a pain and suffering award of $130,000.00. Br. at 1. In support, he cites three Program damages determinations: *Danielson*,[5] *Cooper*,[6] and *Binette*.[7] Br. at 8. The awards for past pain and suffering in those cases were $110,000.00, $110,000.00, and $130,000.00 respectively.[8]

Petitioner asserts that this case is most similar to *Binette*, with his injury more pronounced than what was experienced by the *Danielson* and *Cooper* petitioners. Br. at 9. He emphasizes that he sought care only four days after vaccination, sooner than the petitioner in *Binette*, and much sooner than the petitioners in *Danielson* and *Cooper*. *Id.* He asserts that he consistently reported moderate to severe pain rated five to seven out of ten for over two years and four months. *Id.* at 9. And his MRI findings were comparatively more severe than the petitioners in *Binette* and *Danielson*. *Id.* at 10.

Petitioner emphasizes that he underwent multiple rounds of physical therapy, attending a total of 26 sessions. Br. at 10. He received a Toradol injection and three cortisone injections. *Id.* He asserts that his orthopedist recommended surgery. *Id.* He asserts that this "confirms a more severe injury than the petitioners in *Binette*, *Danielson*, and *Cooper*, who were not candidates for surgery." *Id.* Otherwise, his left SIRVA remains symptomatic, and he still experiences significant difficulty with work duties. *Id.* He reports that he is considering left shoulder surgery, which would require extensive post-operative treatment and require lengthy time off of work. *Id.* But he discontinued physical therapy because his copay for each session ($75) was unaffordable to him, leading him to self-treat with home exercise. Reply at 3.

Respondent argues that the pain and suffering award should be only approximately half of what Petitioner requests, or $67,500.00. Opp. at 13. Respondent relies primarily on *Murray*[9] and *Winkle*,[10] where the relevant petitioners received

---

[5] *Danielson v. Sec'y of Health & Human Servs.*, No. 18-1878V, 2020 WL 8271642 (Fed. Cl. Spec. Mstr. Dec. 29, 2020).

[6] *Cooper v. Sec'y of Health & Human Servs.*, No. 16-1387V, 2018 WL 6288181 (Fed. Cl. Spec. Mstr. Nov. 7, 2018).

[7] *Binette v. Sec'y of Health & Human Servs.*, No. 16-0731V, 2019 WL 1552620 (Fed. Cl. Spec. Mstr. Mar. 20, 2019).

[8] Additional amounts were awarded for future pain and suffering in *Danielson* and *Binette.*

[9] *Murray v. Sec'y of Health & Human Servs.*, No. 18-0534V, 2020 WL 4522483 (Fed. Cl. Spec. Mstr. July 6, 2020).

[10] *Winkle v. Sec'y of Health & Human Servs.*, No. 20-0485V, 2022 WL 221643 (Fed. Cl. Spec. Mstr. Jan. 11, 2022).

$65,000.00 and $68,500.00, respectively. Respondent argues that Petitioner's contention that his injury was severe is belied by his own characterization of his injury in medical records as slight to moderate, in Ex. 6 at 6. Tr. at 8. Respondent emphasizes that by early 2020, Petitioner reported returning to the gym and doing pushups and other exercises, suggesting that his pain was improving and not interfering significantly with his activities. Tr. at 9.

*Murray* in particular has many similarities to this case, Respondent maintains. There as here, the petitioner received three steroid injections, attended significant physical therapy, and demonstrated approximately one year of symptoms. Opp. at 17. In addition, Respondent maintains that the petitioners in both cases had symptoms that were likely due to an underlying cause, in this case Petitioner's labral tear and arthritis, rather than SIRVA-associated sequelae. *Id.* at 17-18. This matter is also akin to *Winkle* in terms of the clinical course. *Id.* at 18. The *Winkle* petitioner underwent four steroid injections, almost 50 physical therapy sessions, and symptoms lasting over two years. *Id.* And both petitioners experienced relatively mild symptoms. *Id.*

Respondent acknowledges that the petitioners in *Winkle* and *Murray* both delayed treatment by several months, making their circumstances somewhat different. Opp. at 18. However, Respondent cites several other cases involving mild to moderate SIRVA cases with similar pain and suffering awards. *Id.* (*citing Edens* ($70,000.00 pain and suffering award), *Bartholomew* ($65,000.00 pain and suffering award), and *Smallwood* ($72,500.00 pain and suffering award)).[11]

Respondent also argues that the cases cited by Petitioner are distinguishable. Opp. at 15. The *Binette* petitioner, for example, was found to have a condition that was likely permanent. *Id.* at 16. In addition, that individual treated for three years, undergoing five cortisone injections and multiple rounds of physical therapy, while experiencing excruciating pain and significant limitations in her ROM. *Id.* The petitioner in *Danielson* had bursitis findings on two MRIs taken a year apart, and consistently reported severe pain that interfered with her daily activities. *Id.* Her orthopedist stated that there were no other treatment options, meaning she would likely experience permanent pain. *Id.* Respondent asserts that *Cooper* also involved a petitioner with a more severe injury, including an adhesive capsulitis diagnosis that continued over two years after vaccination. *Id.*

Petitioner replies that *Murray* is distinguishable, because that petitioner had

---

[11] *Edens v. Sec'y of Health & Human Servs.*, No. 19-1110V, 2021 WL 218720 (Fed. Cl. Spec. Mstr. Apr. 26, 2021); *Bartholomew v. Sec'y of Health & Human Servs.*, No. 19-1580V, 2020 WL 2639805 (Fed. Cl. Spec. Mstr. June 5, 2020); *Smallwood v. Sec'y of Health & Human Servs.*, No. 18-291V, 2020 WL 2954958 (Fed. Cl. Spec. Mstr. Apr. 29, 2020).

sustained injuries from clearly unrelated incidents, including a motor vehicle accident and a horse-riding injury, for which she received treatment before, during, and after her SIRVA treatment. Reply at 9. Petitioner also argues that *Murray* involved a less severe injury because she had fewer orthopedic visits, and only two cortisone injections and 15 physical therapy sessions over the course of a year. *Id.* at 10. *Winkle* and *Smallwood* involved a delay of several months in seeking treatment and a drastic improvement in pain levels. *Id.* at 10. And *Edens* and *Bartholomew* involves only mild levels of pain. *Id.* at 11.

Overall, one reason for the parties' inability to come to an agreement on pain and suffering stems from the fact that they dispute the duration of Petitioner's injury, with Petitioner taking the position that his injury continued and he "is still receiving treatment for his injury to this day, over two years and four months after vaccination." Br. at 10. He acknowledges that he did not see his orthopedist Dr. Stark for nearly a year (between October 2020 and August 2021), but asserts that he reported shoulder pain to his primary care physician in the interim, and that in any event the fact that he did not return to Dr. Stark for ten months does not establish that his symptoms had resolved. Reply at 4. Petitioner asserts that he "complained of constant pain in his left shoulder to his primary care provider in February and August 2021," contrary to Respondent's contention that his pain suddenly worsened in August 2021. Reply at 5.

At the damages hearing, Petitioner argued that his pain continued "to this day, almost three years later." Tr. at 5. He asserted that he did not rush back to see his orthopedist because the doctor refused to give more than three cortisone injections. Tr. at 16. Petitioner argues that there is no evidence that he re-injured his shoulder in 2021. Tr. at 17.

Respondent contends that Petitioner's SIRVA largely resolved within approximately 13 months. Opp. at 14. Respondent further notes that Petitioner appears to have had a period of improvement between the end of physical therapy on July 1, 2020 and his next visit to Dr. Stark in October 2020. Tr. at 10. Respondent emphasizes that Petitioner did not seek any care during this time, and when he returned to Dr. Stark in August 2021, he reported that his pain had *returned* (as opposed to continuing at some level). *Id.* Respondent adds that there is no record evidence that Dr. Stark declined to provide more than three steroid injections. Tr. at 20. Thereafter, Petitioner's orthopedist attributed his pain to arthritis or a labral tear. Opp. at 14 (*citing* Ex. 21 at 5-6). Respondent argues that neither of those conditions could be explained by SIRVA and, thus, it is unlikely that Petitioner's symptoms and treatment in 2021 were related to his SIRVA. Opp. at 15. Respondent adds that at this appointment, Dr. Stark no longer stated that he thought Petitioner's pain was related to vaccination, and that vaccination was not discussed at all. Tr. at 11.

Finally, the parties dispute whether the second MRI showed evidence of bursitis. Respondent asserts that the second MRI, done in 2021, showed increased arthritis but no bursitis. Tr. at 14. Petitioner counters that the 2021 MRI did in fact show trace bursal fluid. *Id.* at 16.

### 4. Analysis

Based on the record and parties' arguments, I conclude that Petitioner suffered a relatively mild SIRVA injury that did not require surgical intervention. The overall duration of his injury was approximately thirteen months, and although I acknowledge that he may have experienced some lingering sequela thereafter (which the pain and suffering award reflects), the course of his injury suggests a pain and suffering award more in line with Respondent's proposed comparables.

Petitioner promptly sought care for his shoulder condition, and treated with cortisone injections, an injection for pain relief, physical therapy, and medication. After approximately ten months, however, he stopped physical therapy, and sought minimal treatment thereafter. He returned to his orthopedist a few months later for another cortisone shot, and then sought no specific treatment until ten months thereafter, for shoulder pain that was attributed to a torn labrum. During that gap, he was seen by his primary care physician in February 2021 and reported pain in his several parts of his body, including his left shoulder, but which the record suggests was not *solely* related to his shoulder.[12]

I acknowledge Petitioner's reasonable comparisons of his case to specific factors that were relevant in *Binette*, *Danielson*, and *Cooper*, such as how soon the petitioners sought care, how many steroid injections they received, how many physical therapy sessions they sought, pain ratings, and the overall duration of treatment and symptoms. All such factors bear on pain and suffering. However, it remains the case that Petitioner's overall course and presentation was less severe. Thus, the petitioner in *Binette* reported severe pain levels, and had a diagnosed permanent injury. The petitioners in *Binette* and *Cooper* were diagnosed with adhesive capsulitis. The injuries in *Cooper* and *Danielson* were worse and continued for a longer time.

A lack of surgical intervention is also important. While surgery was discussed, Petitioner's orthopedist did not consider it warranted, and it was never performed.

---

[12] Petitioner also relies on a visit to Dr. Tran on August 19, 2021. This record provides little support to Petitioner's claim. At the August 19th appointment, he reported shoulder pain that flared on a periodic basis, in addition to pain in his back, knees, and other areas. He did report a pain level of 8/10, but this appeared to refer to knee pain. Ex. 19 at 36.

Petitioner's assertions in his brief that he continued treatment for two years and four months, and at the hearing that his pain continued to this day, nearly three years later, are not supported by the record.

I find that this case falls somewhat between the circumstances presented in *Murray* and *Edens*. Similar to *Murray*, Petitioner's injury continued for approximately a year. The petitioner in *Murray* experienced more severe pain, rating her pain at 10 out of 10, although the injury duration was slightly shorter. The petitioner in *Murray* also  attended more therapeutic sessions, 22 chiropractor and 15 physical therapy sessions, but had one less cortisone injection. In *Murray*, the award factored in the petitioner's other contributory injuries.

Similar to *Edens*, Petitioner experienced a relatively mild injury in terms of both pain and ROM limitations. The petitioner in *Edens* underwent a more protracted course of treatment. The petitioner in *Edens* had one more cortisone injection, but no formal physical therapy. Both petitioners sought treatment less than a week after vaccination.

Taking all of the above into account, I award Petitioner **$70,000.00** for pain and suffering.

### B. Unreimbursed Medical Expenses

In his brief, Petitioner initially requested $3,154.91 for unreimbursable out of pocket expenses. Br. at 10. Respondent agreed that Petitioner had substantiated $1,846.50 for care through the end of 2020, but argued that he had not shown entitlement to the remaining expenses. Opp. at 19. After the parties were directed to narrow the dispute, however, Petitioner filed a joint status report stating that Respondent now supported reimbursement of $2,306.41, with the parties disputing Petitioner's right to the remaining $744.12 – reflecting treatment expenses incurred between August 24 and September 17, 2021. Joint Status Report, filed Apr. 20, 2022, at 1, 3 (ECF No. 43).

Respondent argued that Petitioner did not establish that the symptoms he reported in late 2021 were vaccine-related. Tr. at 13. Respondent asserted that nothing in the record would support a finding that a SIRVA could suddenly worsen almost two years after vaccination. *Id.* Respondent also noted that there were several other potential explanations for the shoulder pain Petitioner experienced in 2021, including his golfing, weight lifting and gym workouts, and strenuous job. *Id.*

At the damages hearing, I determined that Petitioner should be awarded the agreed upon amount of $2,306.41. Concerning the disputed amount of $744.12, I stated that it was a close issue, but that Petitioner had not demonstrated entitlement to this

amount. I acknowledged that when Petitioner stopped formal treatment in 2020, that did not indicate that his condition had fully resolved, and the pain and suffering award reflects that fact. However, I determined that I could not find that there was preponderant evidence that the disputed expenses for 2021 treatment were for Petitioner's SIRVA, as opposed to symptoms unrelated to it, and thus they were not compensable under the Vaccine Act.

## IV.     Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $70,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.**[13] **I also award $2,306.41 in unreimbursed out-of-pocket expenses.**

Based on the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $72,306.41 in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[14]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[13] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* § 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[14] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.